S:\FILES\5290_MSFT\PLEADINGS\ANSWER AFFDEF.DOC

BELGRADE AND O'DONNELL
20 North Wacker Drive
Suite 1900
Chicago, Illinois 60606
Telephone: (312) 422-1700
Telecopier: (312) 422-1717
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HORNBECK OFFSHORE TRANSPORTATION LLC, | 08 Civ. 594 (NRB) |
| Plaintiff, | VERIFIED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM |
| - v. - | |
| The Tug MARY E. HANNAH, her tackle, engines, boilers, etc., *in rem*, and HANNAH MARINE CORPORATION, | ECF CASE |
| Defendants. | |

Defendant, HANNAH MARINE CORPORATION, ("HANNAH"), by and through its attorneys, KENNEDY LILLIS SCHMIDT & ENGLISH, and BELGRADE AND O'DONNELL, P.C., state as its VERIFIED ANSWER AND AFFIRMATIVE DEFENSES to Plaintiff's VERIFIED COMPLAINT, as follows:

## Jurisdiction

1. This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. §1333.

1

**ANSWER:**     HANNAH admits the allegations contained in Paragraph 1.

## Parties

2.     PLAINTIFF was and is a corporation or other business entity organized and existing under and by virtue of the laws of the State of Delaware, with an office and place of business at 103 Northpark Boulevard, Suite 300, Covington, LA 70433.

**ANSWER:**     HANNAH admits only that upon information and belief, PLAINTIFF maintains and office and place of business in the State of Louisiana.     Answering further, HANNAH lacks sufficient information to either admit or deny the rest and remaining allegations contained in Paragraph 2.

3.     At all material times, PLAINTIFF was the owner and operator of the Barge ENERGY 11105 (the "ENGERY 11105" or "Barge").

**ANSWER:**     HANNAH admits the allegations contained in Paragraph 3.

4.     Upon information and belief, HANNAH was and is a corporation organized and existing under the laws of the state of Illinois, with an office and place of business at 13155 Grant Road, Lemont, IL 60439.

**ANSWER:**     HANNAH admits the allegations contained in Paragraph 4.

5.     Upon information and belief, at all material times, HANNAH was the owner, operator and/or charterer of the Tug MARY E. HANNAH, (the "Tug").

**ANSWER:**   HANNAH admits only that it is the owner and operator of the Tug MARY E. HANNAH.  Answering further, HANNAH denies the rest and remaining allegations of Paragraph 5.

6.   The Tug MARY E. HANNAH is now, or during the pendency of this action, will be within the jurisdiction of this Honorable Court.

**ANSWER:**   HANNAH lacks sufficient information to either admit or deny the allegations contained in Paragraph 6.

### Factual Background

7.   On or about November 10, 2005, Plaintiff HORNBECK and Defendant HANNAH entered into a contract for towage services (hereinafter "the Towing Agreement"), whereby HANNAH agreed to provide towage services for the ENERGY 11105 in consideration for certain agreed monies to be paid to HANNAH by HORNBECK.

**ANSWER:**   HANNAH admits the allegations contained in Paragraph 7.

8.   On or about November 15, 2005, and while performing under the Towing Agreement, HANNAH caused the ENERGY 11105 to run aground and touch bottom.

**ANSWER:**   HANNAH denies the allegations contained in Paragraph 8.

9.   The said grounding caused severe and extensive damages to the ENERGY 11105, its hull, machinery and appurtenances, requiring extensive repairs and incurring attendant expenses, including but not limited to, towage charges, drydocking fees, surveyors' fees, attendance fees, etc.  As such, the Barge could no longer be used by HORNBECK until such time as the necessary repairs were made to the Barge, its hull, machinery, appurtenances, etc.

3

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
9.


     10.   That HORNBECK incurred said physical repairs and asso-
ciated expenses of approximately $205,000, as nearly as can now
be calculated.

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
10.


     11.   As a further result of the grounding, the ENERGY 11105
was significantly delayed in arriving at New York.

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
11.


     12.   That due to these delays, HORNBECK incurred demurrage
charges of approximately $22,000.

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
12.


     13.   Further, due to the grounding, the ENERGY 11105 was
unable to be used for approximately 21 days while repairs were
performed on the Barge.

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
13.


     14.   That as a result of HORNBECK's loss of use of the
ENERGY 11105, HORNBECK incurred lost profits of approximately
$160,000.00 as nearly as can now be calculated.

**ANSWER:**     HANNAH   denies   the   allegations   contained   in   Paragraph
14.

## AS AND FOR A FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT)

15.  HORNBECK repeats and realleges each and every allegation contained in paragraphs 1 through 14 of the Verified Complaint with the same force and effect as it fully set forth at length herein.

ANSWER:   HANNAH incorporates and restates its Answers to Paragraphs 1 through 14, inclusive, of its Verified Answer to the Verified Complaint as its Answer to Paragraph 15 to "AS AND FOR A FIRST CAUSE OF ACTION (BREACH OF CONTRACT)" of the Verified Complaint.

16.  On or about November 15, 2005, the terms and conditions and provisions of the Towing Agreement were in full effect.

**ANSWER:**   HANNAH admits the allegations contained in Paragraph 16.

17.  Under and pursuant to the Towing Agreement, HANNAH was obligated to perform proper towage services and exercise due diligence to tender a seaworthy tug which was to be "adequate equipment in good working order and condition." And "seaworthy, reasonably fit for its intended purpose, properly manned and equipped. . ."

**ANSWER:**   HANNAH admits that said Towing Agreement contains the aforementioned quoted language but that otherwise said Towing Agreement speaks for itself. Answering further, HANNAH admits that it performed all of its obligations under said Towing Agreement, including but not limited to, performing proper towage services, tendering a seaworthy tug which was adequate

5

equipment in good working order and condition, reasonably fit

for its intended purposes, and properly manned and equipped, un-

der said Towing Agreement.  Further answering, HANNAH denies the

rest and remaining allegations insofar as they have not been ad-

mitted.

18.  Section 2.7 of the Towing Agreement provided that "all
Work covered hereby shall be performed at the sole risk of TUG
OWNER" and "[t]he towing services provided in this Agreement,
including without limitation the selection of route, navigation,
and the safety thereof, remain entirely within the sole control
of TUG OWNER.  TUG OWNER shall perform all work with due dis-
patch unless otherwise agreed."

**ANSWER:**    HANNAH admits that said Towing Agreement contains the

aforementioned quoted language but that said Towing Agreement

otherwise speaks for itself.  Answering further, HANNAH admits

that HANNAH performed all of its obligations, including but not

limited to, performing towage, selecting a route, navigation,

safety, and performing all work with due dispatch, under said

Towing Agreement.  Further answering, HANNAH denies that the

aforementioned quoted language expanded HANNAH's duties or obli-

gations pursuant to the Towing Agreement and/or under the law

and denies that said language relieved HORNBECK of any of its

duties or obligations under the law.

19.  Defendant HANNAH breached the Towing Agreement in
failing to properly perform the said towage services and/or
failing to exercise due diligence in tendering a tug that was
"seaworthy, reasonably fit for its intended purposes, properly
manned and equipped. . ."

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph
19.


20.  By reason of the premises, HORNBECK has sustained dam-
ages including the costs of obtaining marine surveys of the dam-
age, the costs of towing and repairs, the costs of towing and
repairs, the costs of the loss of use of the ENERGY 11105, and
other substantial expenses necessarily incurred and to be in-
curred as a result of the grounding in the amount of approxi-
mately $390,000, as nearly as can now be calculated.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph
20.


### AS AND FOR A SECOND CAUSE OF ACTION

#### (BREACH OF WARRANTY OF WORKMANLIKE SERVICE)

21.  HORNBECK repeats and reallages each and every allega-
tion contained in paragraphs 1 through 20 of the Verified Com-
plaint with the same force and effect as it fully set forth at
length herein.

**ANSWER:**    HANNAH  incorporates  and  restates  its  Answers  to  Para-

graphs 1 through 20, inclusive, of its Verified Answer to the

Verified Complaint as its Answer to Paragraph 21 to "AS AND FOR

A SECOND CAUSE OF ACTION (BREACH OF WARRANTY OF WORKMANLIKE

SERVICE)" of the Verified Complaint.


22.  By virtue of its undertaking and agreement to perform
maritime towage services, HANNAH warranted to perform such ser-
vices in a workmanlike manner.

**ANSWER:**    HANNAH  admits  only  that  said  Towing  Agreement  speaks

for itself.  Answering further, HANNAH denies that it breached

any duty imposed on it by the agreement or by law and specifically denies the allegations contained in Paragraph 22.

23.  Moreover, under the Towing Agreement HANNAH specifically warranted that it had "adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and/or otherwise performing towing services . . ." and further warranted that it "is fit, willing, and able to provide services . . . in a competent and workmanlike manner."

**ANSWER:**    HANNAH admits that said Towing Agreement contains the aforementioned quoted language but that said Towing Agreement otherwise speaks for itself.    Answering further, HANNAH performed all of its obligations, including performing towage, providing adequate equipment, providing appropriately trained personnel, and provided said services in a competent and workmanlike manner, under said Towing Agreement.    Further answering, HANNAH denies that the aforementioned quoted language expanded HANNAH's duties or obligations pursuant to the Towing Agreement and/or under the law and denies that said language relieved HORNBECK of any of its duties or obligations under the law.

24.  HANNAH breached its warranty of workmanlike service, which was owed to HORNBECK.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph 24.

25.  By reason of the premises, HORNBECK has sustained damages including the costs of obtaining marine surveys of the damage, the costs of towing and repairs, the costs of towing and repairs, the costs of the loss of use of the ENERGY 11105, and other substantial expenses necessarily incurred and to be in-

8

curred as a result of the grounding in the amount of approxi-
mately $390,000, as nearly as can now be calculated.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph

25.


### AS AND FOR A THIRD CAUSE OF ACTION

### (BREACH OF BAILMENT)

26. HORNBECK repeats and reallages each and every allega-
tion contained in paragraphs 1 through 25 of the Verified Com-
plaint with the same force and effect as it fully set forth at
length herein.

**ANSWER:**    HANNAH incorporates and restates its Answers to Para-

graphs 1 through 25, inclusive, of its Verified Answer to the

Verified Complaint as its Answer to Paragraph 26 to "AS AND FOR

A THIRD CAUSE OF ACTION (BREACH OF BAILMENT)" of the Verified

Complaint.


27. At all relevant time herein, the ENERGY 11105 was in
the exclusive care, custody and control of defendant HANNAH.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph

27.


28. On or about November 10, 2005, when the ENERGY 11105
was tendered to HANNAH for towage services, the said Barge was
in all respects seaworthy and in good order and condition.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph

28.


29. Following the performance of towage services by
HANNAH, during which HANNAH caused the ENERGY 11105 to run
aground, and upon re-tender of the said Barge to HORNBECK, the

Barge its hull, machinery and appurtenances were severely damaged and required extensive drydocking and repairs.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph 29.

30.    By reason of the premises, HORNBECK has sustained damages including the costs of obtaining marine surveys of the damage, the costs of towing and repairs, the costs of towing and repairs, the costs of the loss of use of the ENERGY 11105, and other substantial expenses necessarily incurred and to be incurred as a result of the grounding in the amount of approximately $390,000, as nearly as can now be calculated.

**ANSWER:**    HANNAH denies the allegations contained in Paragraph 30.

### AS AND FOR A FOURTH CAUSE OF ACTION

#### (NEGLIGENCE)

31. HORNBECK repeats and reallages each and every allegation contained in paragraphs 1 through 30 of the Verified Complaint with the same force and effect as it fully set forth at length herein.

**ANSWER:**    HANNAH incorporates and restates its Answers to Paragraphs 1 through 30, inclusive, of its Verified Answer to the Verified Complaint as its Answer to Paragraph 31 to "AS AND FOR A FOURTH CAUSE OF ACTION (NEGLIGENCE)" of the Verified Complaint.

32.    At all relevant times herein, the ENERGY 11105 was in the exclusive care, custody and control of DEFENDANTS HANNAH and the Tug MARY E. HANNAH.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph 32.

    33.  DEFENDANTS  owed  a  duty  of  care  to  HORNBECK  and  to  the ENERGY 11105.

**ANSWER:**    HANNAH  denies  that  it  breached  any  duty  imposed  on  it by  law  and  specifically  denies  the  allegations  contained  in Paragraph 33.

    34.  On  or  about  November  10,  2005,  when  the  ENERGY  11105 was  tendered  to  DEFENDANTS  for  towage  services,  the  said  Barge was  in  all  respects  seaworthy  and  in  good  order  and  condition.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph 34.

    35.  During  the  performance  of  the  said  towage  services  by DEFENDANTS,  the  ENERGY  11105  was  caused  to  run  aground,  due  to the  carelessness,  recklessness,  negligence  and  lack  of  due  care on  the  part  of  DEFENDANTS.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph 35.

    36.  Under  re-tender  of  the  said  Barge  to  HORNBECK,  the ENERGY  11105,  its  hull,  machinery  and  appurtenances  were  all  severely  damaged  and  required  extensive  drydocking  and  repairs.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph 36.

    37.  DEFENDANTS  breached  their  duty  of  care  that  they  owed to  HORNBECK  and  to  the  ENERGY  11105.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph
37.


38.  By reason of the premises, HORNBECK has sustained dam-
ages including the costs of obtaining marine surveys of the dam-
age, the costs of towing and repairs, the costs of towing and
repairs, the costs of the loss of use of the ENERGY 11105, and
other substantial expenses necessarily incurred and to be in-
curred as a result of the grounding in the amount of approxi-
mately $390,000, as nearly as can now be calculated.

**ANSWER:**    HANNAH  denies  the  allegations  contained  in  Paragraph
38.


   **WHEREFORE**, the Plaintiff, HANNAH MARINE CORPORATION de-

nies that Plaintiff HORNBECK OFFSHORE TRANSPORTATION, LLC is en-

titled  to  damages  in  any  amount  whatsoever  and  further  prays

that  this  court  dismiss  its  Verified  Complaint  with  prejudice

and award HANNAH MARINE CORPORATION its costs.


### VERIFIED AFFIRMATIVE DEFENSES


39.  Without  prejudice  to  its  denials  or  any  and  all  other

statements  made  in  its  Verified  Answer,  the  Defendant  HANNAH

MARINE  CORPORATION,  states  as  its  Verified  Affirmative  Defenses

to Plaintiff's Verified Complaint as follows:


### FIRST AFFIRMATIVE DEFENSE


40.  Pursuant  to  the  Towing  Agreement,  neither  HANNAH,  nor

the tug MARY E. HANNAH, is responsible for any loss or damage or

delay or failure in performing under any agreement arising from an Act of God, such as weather, wind, or water conditions.

## SECOND AFFIRMATIVE DEFENSE

41.  HORNBECK failed to mitigate its own damages or made them worse by laying up the ENERGY 11105 to perform service or repairs not required, or performed service or repairs as regular maintenance and/or service unrelated to any towage performed by HANNAH.

## THIRD AFFIRMATIVE DEFENSE

42.  On or about November 10, 2005, when the ENERGY 11105 was tendered to HANNAH for towage services, the said Barge was not in all respects seaworthy and in good order and condition such that repairs and servicing were required upon noting such damage.

## FOURTH AFFIRMATIVE DEFENSE

43.  red to HANNAH for towage services, the said Barge was not in all respects seaworthy and in good order and condition such that repairs and servicing were required separate and apart of any alleged damages while in the possession and control of HANNAH.

## FIFTH AFFIRMATIVE DEFENSE

13

44. As a towage contract is not one of bailment, and therefore, HORNBECK fails to state a claim upon which relief can be granted.

### SIXTH AFFIRMATIVE DEFENSE

45. Any agreement between HORNBECK and HANNAH contain Welland canal demurrage and/or Seaway demurrage clauses which reduce any damages HORNBECK might claim.

### SEVENTH AFFIRMATIVE DEFENSE

46. It was the duty of Plaintiff, HORNBECK, before, at the time of, and after the occurrence alleged in its Verified Complaint, to exercise due care and caution in a manner so as not to injure or cause damage to itself.

47. Notwithstanding said duty, and in breach thereof, Plaintiff, HORNBECK was guilty of acts or omissions of negligence, misconduct or fault, in causing its own injuries, including but not limited to the following:

a.   negligent in providing an unseaworthy barge and/or a barge not in proper and good condition, such that it was laid up for a longer period of time than necessary and underwent repairs and servicing which contributed to in whole or in part cause HORNBECK's damages; and/or,

b.   Was otherwise careless and negligent in causing its own injuries.

14

48.   The aforementioned negligence, misconduct and/or fault of Plaintiff, HORNBECK, contributed in whole or in part, to proximately cause the alleged injuries and damages for which Plaintiff now seeks recovery.

49.   As a result of the negligence, misconduct and/or fault of Plaintiff, HORNBECK, Plaintiff is precluded from any recovery from Defendant, HANNAH, or in the alternative, any damages awarded to Plaintiff, shall be diminished in proportion to the amount of negligence, misconduct and/or fault attributable to Plaintiff, HORNBECK.

**WHEREFORE,** Defendant HANNAH MARINE CORPORATION denies that the Plaintiff, HORNBECK OFFSHORE TRANSPORTATION, LLC, is entitled to judgment against it in any amount whatsoever and further prays that this Court dismiss Plaintiff's lawsuit with prejudice and award Defendant its costs.  In the alternative, and to the extent any damages are awarded to Plaintiff, HORNBECK OFFSHORE TRANSPORTATION, LLC, said amount of damages should be reduced in proportion to the amount of negligence, misconduct and/or fault attributable to Plaintiff, and, if the negligence, misconduct and/or fault on the part of Third-Party Plaintiff is determined by the trier of fact to be the proximate cause of the alleged injuries and damages for which Plaintiff seeks recovery, then, under law, Defendant should not be held liable to Plaintiff.

## VERIFIED COUNTERCLAIM - BREACH OF CONTRACT

NOW COMES Counter-Plaintiff, HANNAH MARINE CORPORATION, ("HANNAH"), by and through its attorneys, KENNEDY LILLIS SCHMIDT & ENGLISH, and BELGRADE AND O'DONNELL, P.C., state as its VERIFIED COUNTERCLAIM against Plaintiff HORNBECK OFFSHORE TRANSPORTATION, LLC, ("HORNBECK"), as follows:

## Jurisdiction

50. This is an admiralty and maritime action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. §1333.

51. In the alternative, this Court has supplemental jurisdiction pursuant to 28 U.S.C. 1367(a) as this claim derives from a common nucleus of operative fact.

## The Parties

52. Upon information and belief, HORNBECK is a Delaware corporation with its principal place of business in Covington, Louisiana.

53. At all times relevant, HORBECK was the owner and operator of the Barge ENERGY 11105 (the "ENGERY 11105" or "Barge").

54. HANNAH is an Illinois corporation with its principal place of business in Lemont, Illinois.

55. HANNAH is the owner and operator of the Tug MARY E. HANNAH, (the "Tug").

## Allegations

56. At all times relevant there was in full force and effect a contract of towage entered into by and between

16

HANNAH and HORNBECK. (A true and accurate copy of said contract comprised of Master Towing Agreement Contract No. 08-05-0011 and Work Order dated November 10, 2005 is here-inafter attached as Group Exhibit A)

57. Pursuant to said contract, HANNAH performed certain services relating to the tow of the ENERGY 11105.

58. Pursuant to said contract, HANNAH was to be paid for its towage services as it related to the ENERGY 11105.

59. HANNAH delivered said ENERGY 11105 pursuant to said contract.

60. HANNAH has demanded payment from HORNBECK for the services rendered relating to the tow of the ENERGY 11105.

61. HORNBECK has not paid HANNAH the full amount for said services pursuant to said contract.

62. HORNBECK is in breach of the contract by its failure to pay monies due and owing.

63. HANNAH is also due demurrage.

64. Pursuant to said contract, HANNAH is still due at least $59,189.30 for said towage services.

65. In the alternative, HANNAH is entitled to reasonable compensation for the services rendered.

**WHEREFORE**, HANNAH MARINE CORPORATION prays that this Court enter judgment in its favor and against HORNBECK OFFSHORE TRANSPORTATION, LLC, in an amount of not less than $59,189.30, award it its, costs, expenses, fees, and prejudgment interest.

Dated:    New York, New York      BELGRADE AND O'DONNELL
          March 27, 2008          Attorneys for Defendants


                            By: _____
                                James Saranteas (JS3793)
                                20 North Wacker Drive - Suite 1900
                                Chicago, Illinois 60606
                                Telephone:  (312) 422-1700


                                KENNEDY LILLIS SCHMIDT & ENGLISH
                                Local Counsel for Defendants


                            By: _____
                                Michael P. Hartman (MH8993)
                                75 Maiden Lane – Suite 402
                                New York, New York  10038-4816
                                Telephone:  212-430-0800

## VERIFICATION

Bob Clark, Traffic Manager of HANNAH MARINE CORPORATION, the undersigned, deposes and says that for purposes of executing this document on behalf of the corporation as its representative and, while he does not have personal knowledge of all facts recited in the foregoing Answer, Affirmative Defenses, and Counterclaim, information contained therein has been collected and has been made available to him by agents and/or employees of the corporation and that said Answer, Affirmative Defenses, and Counterclaim, are believed to be true and correct to the best of his knowledge and belief, based upon the information and material made available to him, except as to the matters therein stated to be alleged on information and belief, and as to those matters, he believes them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:  March 25, 2008

_Bob Clark_
Bob Clark

1

**HORNBECK OFFSHORE TRANSPORTATION, LLC**
103 Northpark Boulevard
Suite 300
Covington, LA 70433
Telephone: 985-727-2000
Fax: 985-727-2006

## MASTER TOWING AGREEMENT
(HOT MTA #05-0011)

## THIS AGREEMENT CONTAINS INDEMNITY
## AND INSURANCE PROVISIONS BINDING ON TUG OWNER

THIS AGREEMENT, made and entered into this _____ day of October, 2005, by and between **Hornbeck Offshore Transportation, LLC** (hereinafter referred to as "OWNER") a Delaware limited liability company with offices at 103 North Park Boulevard, Suite 300 Covington, Louisiana, 70433, and **Hannah Marine Corporation**, (hereinafter referred to as "TUG OWNER") a Corporation with offices at _13155 Grant Rd. Lemont, Il  60439_

### WITNESSETH:

WHEREAS, OWNER directly or through its affiliates is engaged in the marine transportation business, and in the course of such operations regularly and customarily enters into contracts with independent contractors for the performance of towing services relating thereto or to the vessels and other equipment and property of OWNER, its affiliates and its customers; and

WHEREAS, OWNER desires to establish and maintain an approved list of towing contractors and to offer work or contracts only to those towing contractors who are included on such approved list; and

WHEREAS, TUG OWNER represents and warrants that it has adequate equipment in good working order and fully trained personnel capable of efficiently

Master Towing Agreement
HOT/Hannah

CONTRACT NO.: 08-05-0011
Date: October 31, 2005

**EXHIBIT**
_A_

operating such equipment and/or otherwise performing towing services for OWNER;

**NOW, THEREFORE, IN CONSIDERATION** of the mutual promises, covenants, conditions, and agreements herein contained, and the specifications and special provisions set forth in Towing Work Orders as hereinafter defined, and other exhibits issued pursuant to this Agreement, all of which are incorporated by reference and made a part hereof, the parties hereto mutually agree as follows:

## 1.0   GENERAL PROVISIONS

1.1   TUG OWNER shall provide adequate equipment in good working order and condition and fully trained personnel capable of efficiently operating such equipment and/or otherwise performing services for OWNER in a workmanlike manner at locations and/or vessels designated by OWNER from time to time. Upon execution of this Agreement and compliance with its terms, OWNER agrees that the name of TUG OWNER shall be added to the OWNER'S approved list of towing contractors. This Agreement shall remain in force and effect until canceled by either party giving the other party thirty (30) days advance notice in writing in the manner provided for in this Agreement. If TUG OWNER performing services for OWNER at the time that TUG OWNER gives notice of termination, cancellation shall not be effective until such services are completed or terminated earlier by OWNER.

1.2   This Agreement shall control and govern all towing services performed by TUG OWNER for OWNER under subsequent oral and/or written Work Orders for Towing Services, and all other occasions when TUG OWNER or its personnel is present upon OWNER's vessels, premises, or other work sites, whether or not TUG OWNER is then working for OWNER or another party. At such time as OWNER desires TUG OWNER to perform towing services, OWNER shall issue to TUG OWNER a Towing Work Order, in the form of Exhibit A. The terms and conditions of this Agreement shall be deemed incorporated by reference in such Towing Work Order as though set out in full therein and made a part thereof. In the event that any services are performed without a Towing Work Order having been issued, all terms and conditions of this Agreement shall nevertheless be deemed to apply to any towing services provided by TUG OWNER. Any agreement or stipulations in any confirmation of such Towing Work Orders, delivery ticket, rate schedule, bids, proposals, purchase orders, or any other

instrument used by TUG OWNER containing provisions contrary or inconsistent or in addition to the terms and conditions of this Agreement or such Towing Work Orders are rejected and shall not be binding on OWNER or form a part of any agreement between OWNER and TUG OWNER, unless signed by an officer of OWNER.

1.3    The term of this Agreement shall be two years from the date upon which it was executed by both parties, unless otherwise terminated as provided for in this Agreement. Thereafter, this Agreement shall be automatically renewed on its anniversary date for successive one year terms, unless otherwise terminated as provided for in this Agreement.

1.4    OWNER shall be entitled to conduct periodic audits of TUG OWNER to ensure its compliance with laws, regulations and policies made applicable by this Agreement and TUG OWNER shall maintain all records pertaining to work performed under this Agreement for a period of three years following completion of the work.

## 2.0    TOWING TERMS AND CONDITIONS

2.1    TUG OWNER warrants that it is a tower for hire under 49 U.S.C. 13102(12) and will provide lawful and responsible transportation services to OWNER. TUG OWNER warrants that it has all required permits and authorizations from all relevant governmental authorities that are necessary to provide transportation services in interstate and intrastate transport in the United States, and that TUG OWNER is fit, willing, and able to provide services as contemplated by this Agreement. TUG OWNER will provide such services in a competent and workmanlike manner.

2.2    Unless otherwise provided in a Work Order, the tug provided by TUG OWNER shall be deemed to be on-hire as of the time of its arrival to the position of the vessel being towed and shall remain on-hire until released by the OWNER.

2.3    TUG OWNER warrants that the tug it provides is seaworthy, reasonably fit for its intended purpose, properly manned and equipped, including, push wires, towing hawser, bridles, pennant, and shackles to connect the pennant to the bridles, and all other necessary rigging needed to undertake the work that is the subject of this Agreement, at no cost to OWNER. TUG OWNER warrants that all of its tugs are United States Coast Guard

certified and documented with all endorsements applicable for the use contemplated herein.

2.4    OWNER has the option to inspect and vet any vessel or personnel of TUG OWNER, or both, and to reject same without penalty.

2.5    Prior to the commencement of the voyage, OWNER will exercise due diligence to make its barge seaworthy. OWNER warrants that the barge shall be equipped with navigational lights, towing bitts, and an emergency tow line or other retrieval system, and that the barge shall be properly trimmed after all cargo has been loaded aboard.

2.6    Notwithstanding OWNER'S obligation as set forth in paragraph 5, prior to the commencement of the voyage, TUG OWNER warrants that it will exercise due diligence to ensure that the tug and barge are in a seaworthy condition and safe and acceptable to sail.

2.7    In the performance of Work, TUG OWNER shall be deemed to be an independent contractor, with the authority and right to direct and control all details of the Work, OWNER being interested only in the results obtained. However, all Work contemplated shall meet the approval of OWNER and shall be subjected to a general right of inspection. OWNER shall have no right or authority to supervise or give instructions to the employees, agents, or representative of TUG OWNER, and such employees, agents or representatives at all times shall be under the direct and sole supervision and control of TUG OWNER. Any suggestions or directions given by OWNER or its employees shall be given to the superintendent or other person in charge of TUG OWNER'S crew; provided however, that in the event any employee or representative of OWNER should give any order or instructions to the employees of TUG OWNER (which employee or representative of OWNER shall not in any event be authorized to do) and such order is not countermanded by TUG OWNER'S superintendent or other person in charge of TUG OWNER'S employees or crew, it shall be deemed that such orders or instructions are the orders or instructions of TUG OWNER. It is the understanding and intention of the parties hereto that no relationship of master and servant or principal and agent shall exist between OWNER and the employees, agents, or representatives of TUG OWNER, whether by borrowed servant" or any other legal theory, and that all Work covered hereby shall be performed at the sole risk of TUG OWNER. Notwithstanding the foregoing, OWNER may at any time require TUG OWNER to stop the Work in the event that OWNER determines that the manner of Work is

progressing in a potentially unsafe manner. The towing services provided in this Agreement, including without limitation the selection of route, navigation, and the safety thereof, remain entirely within the sole control of TUG OWNER. TUG OWNER shall perform all work with due dispatch unless otherwise agreed.

2.8     The Tug, during the course of a tow, may put into port if the master of the tug considers that repairs or alterations to, or additional equipment for, the vessel being towed are required to permit the vessel to be towed safely to destination, or because of any other reason for which the vessel under tow is responsible. In the event of any breakdown of the tug, or if the master of the tug for any reason considers that repairs, alterations or additional equipment for the tug are required, then in that event, the tug shall be off hire for the entire period commencing upon its deviation from the intended route of sail and until the tug returns to the point of deviation and all associated costs shall be borne b the TUG OWNER until such time as the tug is repaired and services resume at the location where discontinued. In the event of any delay that has or is anticipated to last more than twelve (12) hours, the OWNER may, in its sole discretion terminate the Work Order.

2.9     In the event the vessel under tow breaks away from the tug during the course of the Work by reason of any cause for which the tug is responsible, the tug shall exert all necessary efforts to stand by and render service in saving the vessel without any claim to salvage or to additional compensation for the time spent or services rendered during such efforts.

2.10    The tug may, while in charge of the vessel under tow, go to the assistance of other vessels in distress for the purpose of saving life or property, call at any port for fuel, repairs, supplies or other necessaries, or to land disabled seamen, but time lost by the tug under such circumstances shall not entitle TUG OWNER to claim additional compensation from OWNER.

2.11    Unless otherwise provided in the Work Order, all port charges, pilotages, agencies, taxes, dues, duties, and other expenses upon or in connection with the barge and tug, including all services of assisting tugs, shall be for the account of OWNER. In the event any of the aforementioned charges were incurred as a result of the towing vessel being inadequately manned or in need of repair, the charges shall be for the TUG OWNER'S account.

2.12    Towage money shall be deemed to have been fully earned when the tug completes the voyage and delivers OWNER'S barge to the specified destination or the tug is otherwise released by the OWNER.

2.13    It is expressly agreed between the parties that this is a personal contract and therefore TUG OWNER shall not have the benefit of any exemptions

from, and limitations of, liability to which an owner or bareboat charterer of a vessel is otherwise entitled to under the Limitation of Liability statutes of the United States.

2.14    Neither the TUG OWNER nor the tug nor the OWNER nor its vessel(s) shall be responsible for any loss or damage, or delay or failure in performing hereunder arising solely from: Act of God or war; act of public enemies, pirates or thieves; arrest or restraint of princes, rulers, dictators or people, or seizure under legal process provided bond, if required, is promptly furnished to release the tug and/or vessel; strike, lockout, stoppage or restraint of labor (excluding crew of the tug) from whatever cause, either partial or general; or riot or civil commotion.

3.0    **INSURANCE AND INDEMNITY**

3.1    (a) It is understood and agreed, and is the essence of this Agreement, that the TUG OWNER shall procure and maintain the following minimum required insurance;

(i)    Hull and Machinery Insurance per the American Institute Hull Clauses or equivalent, including full collision with liability to the full hull market value, with the sister ship clause unamended.

(ii)    Protection & Indemnity (P&I) – P&I with a minimum limit of $1,000,000 per occurrence, each vessel separately insured per P&I Form SP-23 or equivalent, amended to include full marine contractual liability, crew, full cargo liability, collision and TUG OWNER's liability (or excess above hull value if covered in hull policy), American Institute Pollution Exclusion and Buy Back Endorsement A, tankerman's liability and contractual/voluntary wreck removal, inclusive of Breach of Warranty/Innocent Owner's coverage in favor of OWNER. Any references to "other than owner"/"as owner" will be deleted as respects the naming of OWNER as an additional assured under the P&I policy.

(iii)    Pollution Liability – Third party pollution liability including clean-up and containment per Water Quality Insurance Syndicate (WQIS) or equivalent covering Oil Pollution Act (OPA) liabilities, CERLA, State Oil Pollution laws, administrative fines and penalties. Any references to "other than owner"/"as owner" will be deleted as respects the naming of OWNER as an additional assured under the P&I policy.

(iv)    Bumbershoot Liabilities:    Bumbershoot liability coverage providing full following form coverage in excess of the primary liability coverages noted above with a total minimum policy limit of one hundred million dollars (Alternatively, the TUG OWNER may provide proof of coverage for a full mutual entry with an International Group P&I Club with extensions for contractual

liability and any "specialists operations", with limits "per Club rules" except oil pollution limit which is one billion dollars.)

(b) All of the foregoing insurance shall name OWNER, the owner of any cargo, the vessel under tow, and it's registered owners ("OWNER GROUP") as additional name insureds and contain a waiver of subrogation in favor of OWNER GROUP but only to the extent of risks and liabilities assumed by the TUG OWNER in this Agreement, provide for 30 days notice of cancellation or material change to be given to OWNER, be deemed primary to any other insurance carried by OWNER GROUP, contain navigation warranties sufficient to address the operations contained in the Work Order, and be with companies/insurers that OWNER approves. As respects such naming and waiving, any references contained in TUG OWNER's policies to "other than owners"/"as owner" will be deleted. All deductibles shall be for TUG OWNER's account and OWNER shall not be responsible for any premiums payable by TUG OWNER.

(c) It is further understood and agreed that in the event of any claim for any loss or damage which would have been or is covered by insurance in subparagraph (a), that OWNER GROUP will look for the payment of any such claim or claims to TUG OWNER'S underwriters on the insurance specified above, it being the intent hereof that all liabilities of the TUG OWNER, its agents, employees, servants, and the towing vessel arising out of this Agreement shall be covered by appropriate marine insurance, the rates prescribed for the towage service herein having been predicated upon this basis. The insurance provided by TUG OWNER shall be deemed to be primary coverage with respect to all insurance and shall not be considered contributory insurance with any policy of the OWNER GROUP.

(d) In the event any such insurance as set forth in subparagraph (a) is non-existent or void, TUG OWNER shall be deemed to be a self-insurer to the same extent as which would have otherwise been covered by the insurance provided by TUG OWNER as described in subparagraph (a) and hereby agrees to waive any and all claims for subrogation against OWNER GROUP.

(ed) Immediately upon the execution of this Agreement, TUG OWNER agrees to furnish OWNER with copies of Certificates of Insurance evidencing the insurance required above and hereby represents and warrants that throughout the term of this Agreement the coverages required herein and described in any certificate of insurance provided to OWNER shall remain in full force and effect. At OWNER'S option, TUG OWNER shall provide OWNER with cover notes or binders and policies.

3.2    (a) TUG OWNER shall be liable in any case of illness, injury or death to employees, agents and other personnel of TUG OWNER and of its contractors and subcontractors, regardless of any active or passive fault, strict liability and/or unseaworthiness on the part of OWNER GROUP.

TUG OWNER shall release, defend, protect, indemnify, and hold harmless OWNER GROUP from and against any loss, cost, claim, liability, suit, judgment or award, including reasonable attorneys fees on account of such illness, injury or death brought by any such person.

(b) OWNER shall be liable in any case of illness, injury or death to employees, agents and other personnel of OWNER and of its contractors and subcontractors, regardless of any active or passive fault, strict liability and/or unseaworthiness on the part of TUG OWNER, the tug and/or its registered owner. OWNER shall release, defend, protect, indemnify, and hold harmless TUG OWNER, the tug and/or its registered owner from and against any loss, cost, claim, liability, suit, judgment or award, including reasonable attorneys fees on account of such illness, injury or death brought by any person.

3.3    The allocations of responsibility, indemnity obligations, releases and insurance obligations set forth above apply only to any event or condition that occurs during the performance of the Agreement but shall survive and not be affected by the expiration of this Agreement.

3.4    TUG OWNER will give immediate notice to OWNER of any and all casualties which occur during the performance of this Agreement, including any loss or damage to the vessel under tow, other property, persons or third parties. Notice must be given in writing, by either emailing or faxing to OWNER at OWNER'S office in Covington, Louisiana.

3.5    If it appears that the vessel under tow, the tug and/or cargo has incurred damage, the parties will arrange for a joint survey to be performed to determine the extent of said damage. The parties will each appoint an independent surveyor, and together both parties' surveyors will attempt to agree on the extent of damage, if any to the vessel, tug and/or cargo. To the extent necessary, the survey shall be performed aboard and access shall be given to the tug, barge and/or cargo or other third party installations, when available.

## 4.0    GOVERNING LAW

4.1    This Agreement shall be governed by and construed in accordance with the general maritime law of the United States and, where the general maritime law is silent, with the laws of the State of New York to apply.

4.2    Any disputes and/or claims arising out of this Agreement shall be brought solely in the United States District Court for the Southern District of New York and each party hereby agrees to submit to the personal jurisdiction of such court.

## 5.0    MISCELLANEOUS PROVISIONS

5.1    This Agreement fully and completely provides the rights and obligations of the parties hereto with respect to the subject matter herein and

supersedes all other agreements, oral or written, with respect to such subject matter and except to the extent expressly provided herein. No modification of this Agreement and no waiver of any of its terms, conditions, or provisions shall be valid or binding unless set forth in a writing duly executed by both parties.

**OWNER:**
**Hornbeck Offshore Transportation, LLC**

_____
Signature

_____
Print Name

_____
Title

_____
Date

**TUG OWNER:**
**Hannah Marine Corporation**

_E dww J Hogan_
Signature

_EDWARD  J.  HOGAN_
Print Name

_VICE  PRESIDENT_
Title

_11/10/05_
Date

Master Towing Agreement
HOT/Hannah

CONTRACT NO.: 08-05-0011
Date: October 31, 2005

WORK ORDER
VESSEL TOWING SERVICES

To:   Hannah Marine Corporation                Phone:    630 257-5457
      Attention: Mr. Edward Hogan              Fax:       630 257-1268

      _____
      _____

Date: November 10, 2005                    Re:       Vessel Towing Services

Pursuant to the terms and conditions of that certain Master Towing Agreement, contract no.: 08-05-0011 dated November 8, 2005, by and between **Hannah Marine Corporation** ("Tower") and **Hornbeck Offshore Transportation, LLC** ("Tow Owner") this is to evidence our understanding and agreement that vessel towing services will be provided by you subject to the following:

1.   Name of Tug ("Tug") and/or horsepower required: Mary E. Hannah/3200 BHP

2.   Vessel(s) to be towed ("Vessel"):   Barge E-11105

3.   Nature and description of towage service: The Tug shall take up the tow of the   Vessel at Sturgeon Bay, Wisconsin on or about November 10, 2005 and deliver the barge to Quebec City, Quebec where the Vessel shall be delivered to a tug to be nominated by Tow Owner or otherwise alongside a safe berth location to be advised by Tow Owner, at which time the Tug will be immediately released to proceed back up the Seaway prior to Seaway closing or be entitled to demurrage as described in #4 below.

4.   Lumpsum Rate:       $290,000.00USD. Includes all Tug fuel and lubes.
     • If both parties agree that Hornbeck will pick up the tow at Port Coburn, rather than at Quebec City, the rate will be reduced by ~~$~~ 50,000   *EH* /.

5.   Date and time of Tug Delivery: On or about November 10, 2005

6.   Approximate Term, if any: Tug departure from Chicago until released at Quebec City

7.   Special Provisions:
     • Towing Rate does not include the following charges, which shall be for Tow Owner's account, arrangements shall be made by the tow owner to have these services directly billed and paid by tow owner including but not limited to:
       o All Seaway and Welland Canal tolls and charges for Tug and Vessel enroute to Quebec and Tug returning to Lake Michigan.
       o All pilots and assist tugs required during the tow, except for assist tugs required in the Detroit River, Welland Canal and or Seaway, due to visibility restrictions of the tug will be shared equally between Hornbeck and Hannah. Hornbeck will ballast barge to 21' draft.   *EH* /
       *St. Clair River system*
       o Riding crew and or seaway line handlers as well as any rigging of gear required by Seaway inspectors for transit of Tow.
       o All customs, immigration, port fees, user tax, agency fees, winter surcharges, barge pollution coverage, etc.

- The Tow will have operating navigation lights, adequate riding crew, an operating anchor and be ballasted to a depth, which will allow operation of the bow thruster.

8.  Demurrage; Demurrage will be charged at a rate of $342.00/hour for delays departing Sturgeon Bay due to barge not being ready to sail, Departing Quebec City due to Hornbeck delaying release of tug, or in the Seaway due to pilots, bridge delays, lock operations, ice, Seaway inspections, traffic, or system closures for fog or high winds. Hannah's rate allows for 12 hours for Welland Canal transit and 50 hours for the Seaway transit.

Payment Terms; In all cases upon Tower's Invoice and as follows: 25% upon execution of this Work Order; 50% upon tow (Tug and Vessel) departure from Sturgeon Bay; and balance to be invoiced upon delivery of the vessel to Quebec City and payable upon receipt. Tower must present original invoice.

Tow Owner   Billing Hornbeck Offshore Transportation, LLC
Address:              103 Northpark Blvd. Suite 300
                        Covington, LA 70433
                        Phone___718.625.0003_____    Fax___718.625.3445_____

Please sign and date this Work Order in duplicate in acceptance of the foregoing and return it to Hornbeck Offshore Operators, LLC at 103 Northpark Blvd. Suite 300, Covington, Louisiana 70433.

TOW OWNER:
HORNBECK OFFSHORE TRANSPORTATION, LLC

By:   _____
Printed Name:   _Carl G. Annessa____
Title:   __Executive Vice President__

TUG OWNER:
HANNAH MARINE CORPORATION

By:   _Edward Hogan___ Hannah Marine Corp.
Printed Name:   _Edward F. Hogan____
Title:   _Vice President_         11/10/05